IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| BRENT JEFFREY LAMBERT, | No. 2:10-cv-02587-JKS |
| Petitioner, | MEMORANDUM DECISION |
| vs. |  |
| MICHAEL MARTEL, Warden, Mule Creek State Prison, |  |
| Respondent. |  |

Brent Jeffrey Lambert, a state prisoner, appearing through counsel, filed a Petition for Habeas Corpus under 28 U.S.C. § 2254.  Lambert is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at Mule Creek Prison.  Respondent has answered, and Lambert has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

Following a jury trial, in June 2007 Lambert was convicted in the Sacramento County Superior Court of six counts of lewd conduct against a minor, Cal. Penal Code § 288(a), involving two, or more victims, Cal. Penal Code § 667.61(e)(5).  The trial court sentenced Lambert to six consecutive terms of fifteen years to life, for an aggregate sentence of ninety years to life.  The California Court of Appeal, Third Appellate District, affirmed Lambert's conviction and sentence in an unpublished decision,[1] and the California Supreme Court denied review on September 16, 2009.  Lambert then filed a petition for habeas relief in the California Supreme

---

[1] *People v. Lambert*, No. C056328, 2009 WL 1964335 (Cal. Ct. App. Jul. 9, 2009).

Court on September 2, 2009, which was denied on March 18, 2010 citing *In re Swain*, 209 P.2d

793, 796 (Cal. 1949).[2]  Lambert timely filed his Petition for relief in this Court on September 17,

2010.

The facts underlying Lambert's conviction, as summarized by the court of appeal:

A. *Report of Abuse*
     C. is the mother of A. and B.  A. was eight years old at the time of the crimes
in 2003 and 12 years old at the time of trial in 2007.  B. was five years old at the time
of the crimes and nine years old at the time of trial.  C. also has two other children.
C. met [Lambert] when they were teenagers and dated for one year before she joined
the military in 1991.  She married another man, but in October 1996, after she had
broken up with her husband, she moved in with [Lambert] in another state.
     In 1999, C. and [Lambert] broke up for several months.  During that time, C.
and the children lived with a woman and a man whom the children called Grandpa
Jim.  On several occasions when Grandpa Jim was alone with the children, he took
A. to his bedroom and molested her.  A. was six years old when this was reported to
the police.  Around August 1999, C. and [Lambert] reunited and lived together again.
     In March 2002, [Lambert], C., and the children moved to the Sacramento
area.
     In March 2003, B. who was five years old at the time, approached C. and said,
"Don't worry mommy, I know daddy and I are not having sex."  C. asked her what
she meant, and B. responded that she wasn't supposed to talk about it and didn't want
A. to know that she had said anything.  C. called A. into the room and asked her what
B. meant by saying that she and [Lambert] were not having sex.  A. became upset at
B. and yelled at her for telling their mother.  A. told C. that, while C. was at work,
[Lambert] had been touching A. and B. sexually.
     C. waited more than one week before going to the police on March 16, 2003,
with the information she received from A. and B.  In the meantime, she took money
out of a joint account with [Lambert] and put it into her own name so that she would
be able to pay rent and bills in the event [Lambert] were to flee.  When C. finally
went to the police, she lied about when the victims had told her about the abuse.
     Deputy Michael Liston of the Sacramento County Sheriff's Department went
to the home to investigate the abuse report.  He interviewed A. and B. together in the
kitchen to substantiate that a crime had occurred.  The conversation lasted 10 or 15
minutes, during which the victims disclosed sexual abuse by [Lambert].
     A. told Deputy Liston that [Lambert] would place his penis between her legs
and attempt to put it in her vagina and anus, both while she faced him and while her
back was to him.  He would spit on his hand for lubrication.  She knew it was wrong

_____
[2] Lodged Doc. No. 11.

but was afraid to say anything. B. would come into the room while A. and [Lambert] were under the covers.

B. told Deputy Liston that [Lambert] had touched her in her "crotch" area with his "dick." Deputy Liston clarified with B. that she was talking about her vaginal area and [Lambert's] penis. A. and B. were interviewed separately at the Multidisciplinary Interview Center (MDIC) on April 2, 2003, 17 days after C. reported the abuse to the police.

B. *A.'s MDIC Interview*

At the time of the interview, A. was eight years old and in second grade. The interviewer established that A. knew the difference between a lie and the truth.

The interviewer asked A. if anything had happened to her that was not "okay." A. responded that [Lambert] "did a bad thing to me and my sister." A. explained that she knew something bad had happened to B. because B. had told her.

During the interview, A. said that what [Lambert] had done to her occurred once in her bedroom and all of the other times in his room. [Lambert] molested her when she was five and six years old. [Lambert] stopped molesting her, then Grandpa Jim molested her and got arrested, then [Lambert] started molesting her again. [Lambert] did not molest her during the time that Grandpa Jim was molesting her. [Lambert] also molested her when she was seven and eight years old.

A. described a game she would play with [Lambert] and B., in [Lambert's] bedroom at night, called "cats." After playing the game, [Lambert] would put his tongue and his penis in her vagina, while using his hands to spread her legs. He would also twist her breasts with his hands. His penis was stiff and he would move back and forth. He would also spit on his hand and wipe it on his penis. A. was too scared to try to get away. B. was in the room when this happened but did not see it happen because [Lambert] and A. were under the covers. This happened while C. was at work. [Lambert] threatened A. that, if she ever told anyone, he would hurt her.

A. said that [Lambert] put his penis in her vagina 17 times and his tongue in her vagina 5 times. He twisted her breasts 16 times. About 20 times, [Lambert] put his penis in her anus. When asked whether anything else happened with [Lambert], A. replied that "[n]othing else different happened." [Lambert] never had A. do anything to his body.

A. said that, when she was five, she told C. about the molestation because her brother saw it happen and got upset. (Later in the interview, A. said that her brother saw Grandpa Jim, not [Lambert], molesting her.) C. got mad at [Lambert] and had A. stay away from him for 60 days, but she did not call the police because, in A.'s words, "it wasn't so bad the first time" and "he wasn't doing that to me very oftenly [*sic* ]."

C. *B.'s MDIC Interview*

At the time of the MDIC interview, B. was five years old and in kindergarten. The interviewer established that B. knew the difference between a lie and the truth, and B. promised to tell the truth.

When the interviewer asked B. whether anything had happened to her body that was not okay, she responded that [Lambert] "did something to my sister and me, and that was gross." He did something to her two times, once in her bed and once in [Lambert's] bed, while C. was at work.

The time that it happened in [Lambert's] bedroom, he put his penis in B.'s vagina. His penis was hard, and he was not moving. He stopped because he had to go to the bathroom. A. was not in the room at the time.

In B.'s bedroom, she was lying on her bed on her stomach. [Lambert] put his penis in her anus. His penis was hard, and he was not moving. Although B. said that something had happened only twice, she said that [Lambert] put his penis in her anus on another occasion also.

B. saw [Lambert] molest A.

D. *The Prosecutor's Interviews of A. and B.*

The prosecutor interviewed A. and B. on May 25, 2007, which was shortly before trial and more than four years after the MDIC interviews. An investigator from the District Attorney's office observed the interview and took notes. The investigator testified concerning the interview.

A. stated that most of [Lambert's] acts took place in the living room during the daytime. He put A. on his lap and put his penis in her anus and his fingers in her vagina. A. and B. played a game called "cats" with [Lambert]. B. was the wild cat, and A. was the house cat. [Lambert] was the father cat. He had A. and B. purr while he touched them sexually. [Lambert] put his penis in A.'s mouth, his penis in her vagina, and his mouth on her vagina and chest. He also hit her in the face with his penis. She said that it happened several times during each week and more than once during some days. She also saw [Lambert] molest B. three times. He made B. watch and purr while he molested A.

B. stated that [Lambert] molested her three times, all in [Lambert's] bedroom. They played "cats," during which they all were on the bed. They rubbed up against [Lambert] and purred and cuddled with him. He threatened her that, if she told anyone, he would kill the entire family.

E. *A.'s Trial Testimony*

A. testified that she was 12 years old and in sixth grade at the time of trial. She demonstrated her knowledge of the difference between truth and lies.

Grandpa Jim molested A. while she lived in another state. One time, her brother saw this happening through the window. They told C. what was happening.

[Lambert] molested A. while she lived in California. (She moved from the state after [Lambert] was arrested.) She did not remember how old she was or what grade she was in when [Lambert] molested her. The molestation took place in the living room or in [Lambert's] bedroom.

In the living room, he would sit on a chair with his pants down and a blanket over him. He would tell A. to sit on his lap and, when she did, he would put his penis in her anus. He did this frequently.

In [Lambert's] bedroom, [Lambert] would put his penis in A.'s vagina and anus and he would touch her chest. He would also put his tongue in her vagina. He

made her put her mouth on his penis.  [Lambert] played "cats" with A. and B.  He would have them crawl around on the bed and purr, then he would molest A.

A. saw [Lambert] put his penis in B.'s vagina once when he was putting her to bed.  B. screamed, and [Lambert] told her to shut up and left.  Another time, in [Lambert's] room, A. saw [Lambert] put his penis in B.'s vagina and anus after he had done the same thing to A.  After he finished with B, he returned to A. and put his penis in her vagina.

A. did not remember talking to the police after C. reported the molestation.  She also did not remember the MDIC interview and could not answer questions concerning that interview.

A. felt that [Lambert] was nicer to B. than to her.  She was "quite happy for him to move out of the house."

F.  *B.'s Trial Testimony*

B. testified that she was nine years old (within a month of being 10) at the time of trial.  She demonstrated her knowledge of the difference between truth and lies.

B. said that [Lambert] sexually abused her three times.  The first incident occurred in [Lambert's] bedroom.  [Lambert] put his penis in B.'s vagina and moved up, down, and sideways.  The second incident also happened in [Lambert's] bedroom.  He put his penis in B.'s anus, while she was lying face down on the bed.  A. saw this happen.

The third and last incident also occurred in [Lambert's] bedroom.  On this occasion, [Lambert] put his penis in B.'s vagina.  [Lambert] made B. stand next to the wall while he then put his penis in A.'s vagina and anus.  Finally, he put B. back on the bed and he put his penis in her anus.  He told A. and B. that, if they told anyone, he would kill them.

B. remembered her MDIC interview.  She acknowledged some discrepancies between her MDIC interview and her trial testimony and stated that "I was littler, and I didn't really know better if I should tell the truth, or just lie."  Later, she said that the discrepancies were mistakes, not lies.  She had wanted the MDIC interview to end and gave answers to move away from the topics that embarrassed her.

G.  *Forensic Evidence*

An expert in evaluating children physically for signs of sexual abuse examined and took photographs of the vaginal areas of A. and B. on March 19, 2003, three days after C. reported the abuse to police.  The expert testified that a young girl's hymen may show signs if there has been sexual abuse but that it may also heal quickly after abuse and return to normal, typically within 10 to 12 days.

On the date of the examination, A.'s hymen was normal.

When B. was examined, however, the expert detected evidence of healed hymenal trauma, which supported a concern that B. had been sexually abused.  The expert concluded that the evidence was consistent with B.'s report that her vagina had been penetrated by a penis.

H.  *Defense Case*

5

The defense case consisted, mainly, of three types of evidence: (1) forensic evidence, (2) evidence concerning suggestive interviewing, and (3) character evidence.

1. Forensic Evidence

The defense presented two experts on child sexual assault examinations who viewed the photographs of the examination of B. Both of them believed that the expert who conducted the examination of B. was mistaken in finding evidence of sexual abuse. One of the experts considered B.'s hymen, as seen in the photographs, to be normal. The other considered B.'s hymen to be unremarkable, consistent with a history of abuse as well as a history of no abuse.

2. Evidence of Suggestive Interviewing

The defense presented the testimony of Dr. William O'Donohue, a psychologist, concerning the evaluation of interviews with and testimony of child sexual abuse victims. He testified that sometimes children lie about being sexually abused or they may mistakenly believe that they have been sexually abused when they have not been. They can form false memories when improper interviewing and other techniques are used.

Dr. O'Donohue criticized the MDIC interviews of A. and B. He opined that the meaning of truth was not sufficiently discussed in the victims' interviews. There were some instances of improper repetitive questions and disconfirmation (leading the child to believe another answer was desired).

In evaluating the interviews, Dr. O'Donohue found there were inconsistencies in some of the core details, rather than just peripheral details. He described some of the core details that were inconsistent in the victims' statements concerning [Lambert's] actions. He also determined that A.'s recollection of [Lambert's] actions may have been contaminated by her abuse by another person.

However, Dr. O'Donohue stated that children as young as five years old can accurately report what happened to them.

In summary, Dr. O'Donohue had concerns about the manner in which the MDIC interviews were conducted but believed that, in all, they were not bad.[3]

## II. GROUNDS RAISED/DEFENSES

In his Petition, Lambert raises five grounds: (1) admission of the videotaped testimony of the two complaining witnesses denied him a fair trial; (2) the failure of his trial counsel to object to the jury's unsupervised viewing of the videotaped evidence during its deliberations denied Lambert the effective assistance of counsel; (3) the failure of trial counsel to submit Lambert to a

---

[3] *Lambert*, 2009 WL 1964335 at *1-5 (alterations added). Except for the petitioner's name, this appears exactly as it does in the original.

psychological examination denied Lambert the effective assistance of counsel; (4) prosecutorial misconduct; and (5) the trial court's refusal to permit defense counsel to cross-examine the mother on whether one of the complaining witnesses had previously claimed that the complaining witness's brother had sexually molested her.  Respondent contends that grounds one through four are procedurally barred.  Respondent asserts no other affirmative defense.[4]

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[5]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."[6]  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.[7]  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court

---

[4] *See* Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(b) (2011).

[5] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[6] *Williams*, 529 U.S. at 412 (alteration added).

[7] *Early v. Packer*, 537 U.S. 3, 10 (2002).

'unreasonabl[y] appli[ed] clearly established Federal law.'"[8]  When a claim falls under the "unreasonable application" prong, a state court's application of Supreme Court precedent must be "objectively unreasonable," not just "incorrect or erroneous."[9]  The Supreme Court has made clear that the objectively unreasonable standard is "a substantially higher threshold" than simply believing that the state-court determination was incorrect.[10]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[11]  In a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[12]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[13]

_____

[8] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations in original) (citation omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753-54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[9] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

[10] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams,* 529 U.S. at 410).

[11] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 643 (1974)).

[12] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[13] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (citations omitted); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas

(continued...)

The Supreme Court recently underscored the magnitude of the deference required:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  *It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.*  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.  *Jackson v. Virginia,* 443 U.S. 307, 332, n.5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.[14]

In applying this standard, this Court reviews the "last reasoned decision" by the state court.[15]  State appellate court decisions that summarily affirm a lower court's opinion without explanation are presumed to have adopted the reasoning of the lower court.[16]  This Court gives

---

[13](...continued)
relief on the basis of little more than speculation with slight support").

[14] *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (emphasis added).

[15] *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza,* 297 F.3d 911, 918 (9th Cir. 2002)); *cf. Ylst v. Nunnemaker,* 501 U.S. 797, 804 (1991) (explaining "how federal courts in habeas proceedings are to determine whether an unexplained order . . . rests primarily on federal law," and noting that federal courts must start by examining "the last reasoned opinion on the claim . . . . ").

[16] *Ylst*, 501 U.S. at 802-03 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); *cf. Richter*, 131 S. Ct. at 784 ("As every Court of Appeals to consider the issue has recognized, determining whether a states court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.").

the presumed decision of the state court the same AEDPA deference that it would give a

reasoned decision of the state court.[17]

## IV.  DISCUSSION

**A.  Defenses**

Lambert presented his first (admission of videotape testimony) and fourth (prosecutorial

misconduct) grounds on direct appeal.  Respondent contends that, because the court of appeal

denied those claims for failure of trial counsel to contemporaneously object, they are

procedurally barred from review in this Court.  Lambert presented his second and third

(ineffective assistance of counsel) grounds in his state-habeas petition.  Respondent contends

that, because the California Supreme Court denied the petition on the ground that it was

untimely, the ineffective assistance of counsel claims are also procedurally barred.

Federal courts "will not review a question of federal law decided by a state court if the

decision of that court rests on a state law ground that is independent of the federal question and

adequate to support the judgment."[18]  This Court may not reach the merits of procedurally

defaulted claims, that is, claims "in which the petitioner failed to follow applicable state

procedural rules in raising the claims . . . ."[19]  "[I]n order to constitute adequate and independent

grounds sufficient to support a finding of procedural default, a state rule must be clear,

---

[17] *See Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was not entitled to § 2254(d) deference).

[18] *Coleman v. Thompson,* 501 U.S. 722, 729 (1991) (citations omitted).

[19] *Sawyer v. Whitley,* 505 U.S. 333, 338 (1992) (citing *Murray v. Carrier*, 447 U.S. 478 (1986)).

consistently applied, and well-established at the time of the petitioner's purported default."[20]   A discretionary state procedural rule can be firmly established and regularly followed, so as to bar federal habeas review, "even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."[21]   Procedurally defaulted claims will not be considered unless Lambert can demonstrate "cause for the default and actual prejudice . . . ."[22] To prove a fundamental miscarriage of justice, Lambert must show that a constitutional violation probably resulted in his conviction despite his actual innocence.[23]   Although at the gateway stage Lambert need not establish his innocence as an "absolute certainty," Lambert must "demonstrate that more likely than not, . . . no reasonable juror could find him guilty beyond a reasonable doubt . . . ."[24]

> If a petitioner has procedurally defaulted on a claim, a federal court may nonetheless consider the claim if he shows: (1) good cause for his failure to exhaust the claim; and (2) prejudice from the purported constitutional violation; or (3) demonstrates that not hearing the claim would result in a "fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *Sawyer v. Whitley,* 505 U.S. 333, 339-40, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).   An objective factor outside of a petitioner's control (e.g., ineffective assistance of counsel or a basis for the claim

---

[20] *Morales v. Calderon,* 85 F.3d 1387, 1393 (9th Cir. 1996) (internal quotations marks and citation omitted).

[21] *Walker v. Martin*, 131 S. Ct. 1120, 1128 (2011) (citing *Beard v. Kindler*, 130 S. Ct. 612, 618 (2009)).

[22] *Coleman,* 501 U.S. at 729 (citations omitted).

[23] *See Schlup v. Delo,* 513 U.S. 298, 321-25 (1995) (linking miscarriages of justice to actual innocence); *United States v. Olano,* 507 U.S. 725, 736 (1993) ("In our collateral-review jurisprudence, the term 'miscarriage of justice' means that the defendant is actually innocent." (citing *Sawyer v. Whitley,* 505 U.S. 333, 339-340 (1992))); *Murray v. Carrier,* 477 U.S. 478, 496 (1986) ("[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.").

[24] *House v. Bell*, 547 U.S. 518, 538 (2006).

11

that was previously unavailable) could constitute cause. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *McCleskey v. Zant,* 499 U.S. 467, 497, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). The petitioner can meet the prejudice prong if he demonstrates "that the errors . . . worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis,* 874 F.2d 599, 603 (9th Cir.1989) (citing *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). A petitioner can demonstrate a fundamental miscarriage of justice by "establish[ing] that under the probative evidence he has a colorable claim of factual innocence." *Sawyer,* 505 U.S. at 339, 112 S.Ct. 2514 (quotation marks omitted).[25]

It is important to note that, in this context, "'actual innocence' means factual innocence, not mere legal insufficiency."[26] To make the requisite showing of actual innocence, Lambert must produce "new *reliable* evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial" and "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."[27] In this case, Lambert makes no "actual innocence" claim.

Grounds 1 and 4

In his first ground, Lambert contends that, because they were not sufficiently reliable, the trial court erred in admitting the videotaped testimony of the two complaining witnesses, which was played for the jury during the prosecution's case-in-chief and made available in the jury room during deliberations.

---

[25] *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011) (alterations in original).

[26] *Bousley v. United States*, 423 U.S. 614, 623-24 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

[27] *Schlup*, 513 U.S. at 324, 327 (emphasis added).

The California Court of Appeal rejected Lambert's arguments, holding:

*Admissibility of Interview Videotapes*

Videotapes of B.'s and A.'s full interviews at the MDIC were admitted. [Lambert] contends that their admission deprived him of his right to a fair trial because the hearsay statements contained in the videotapes were unreliable. [Lambert] forfeited this constitutional argument because he did not object based on the fair trial ground, or any other constitutional doctrine, in the trial court. Even assuming the constitutional argument is not forfeited, defendant also forfeited the reliability argument because he did not make a timely and specific objection based on reliability. Finally, the argument that the statements were so unreliable as to be inadmissible is without merit.

A. *Procedural Background*

The prosecution did not use the videotapes of the victims' MDIC interviews during its case-in-chief. During the defense case-in-chief, [Lambert] showed several excerpts of the videotapes during his questioning of the victims to impeach them with inconsistencies between their MDIC interviews and their trial testimony.

After [Lambert] had shown parts of the MDIC interviews, the prosecution moved to show the entire interviews to the jury, citing Evidence Code section 356, which allows a party to introduce an entire writing or conversation when the opposing party has introduced part of it. [Lambert's] attorney stated that he did not think it was necessary to have the jury hear the preliminary part in which the victims identified themselves and discussed the importance of telling the truth because it was beyond the scope of defense questioning. However, [Lambert's] attorney said that the victims' allegations would "possibly all come in." With that, counsel submitted the question of the admissibility of the videotapes to the court. The trial court ruled that the videotapes were admissible in full.

On the next day of trial, the prosecution played the videotapes for the jury. After the videotapes were played, [Lambert's] attorney objected to the admission of the videotapes pursuant to Evidence Code section 1360. He said: "I don't believe that they would probably be admitted under [Evidence Code section 1360], and I think the basis for the District Attorney's argument and court's ruling being under the prior consistent and inconsistent statements, and rule of completeness, but I certainly don't concede that these would be admissible under 1360." [Lambert's] attorney did not say why he believed the videotapes were not admissible pursuant to Evidence Code section 1360.

After some further discussion, the trial court said, referring to the substance of Evidence Code section 1360: "I am prepared to find that the timing of the tapes, and the content of the tapes, and circumstances of taking these statements is sufficient indicia for reliability, not for the court to vouch for them by any means, but sufficiently reliable for them to be introduced into evidence." The court added that the victims were still subject to recall, even though they had already testified. That ended discussion of the matter.

B. *Analysis*

1. Forfeiture of Constitutional Argument

[Lambert] forfeited his argument that the admission of the videotapes violated his fair trial rights because he did not object to the admission of the videotapes on that ground in the trial court. (*People v. Benson* (1990) 52 Cal.3d 754, 788.)  "[T]he rule that a challenge to the admission of evidence is not preserved for appeal unless a specific and timely objection was made below stems from long-standing statutory and common law principles."  (*People v. Anderson* (2001) 25 Cal.4th 543, 586.)  In any event, the contention is without merit.

2. Forfeiture of Reliability Argument

[Lambert] argues that the videotaped interviews were unreliable under the criteria used for determining admissibility pursuant to Evidence Code section 1360. That section allows admission of hearsay statements made by the victim when the victim was under the age of 12 if certain conditions are met.  One of those conditions is that "the time, content, and circumstances of the statement provide sufficient indicia of reliability."  (Evid.Code, § 1360, subd. (a)(2).)  The determination of whether there is sufficient indicia of reliability is made after a hearing outside the presence of the jury.  However, no such hearing need be held or determination of reliability made if the defendant does not interpose a timely and specific objection. (Evid.Code, § 353.)

[Lambert] failed to preserve an objection based on the reliability of the victims' MDIC statements.  The jury was shown the MDIC interviews via videotape before [Lambert's] attorney raised the issue of whether they were admissible pursuant to Evidence Code section 1360.  Thus, even if the belated statement that counsel did not concede the Evidence Code section 1360 issue could be perceived as an objection, it was untimely, resulting in forfeiture of the issue for appellate purposes. (Evid.Code, § 353.)

[Lambert] was the original proponent of at least some of the statements from the victims' MDIC interview.  As far as reliability is concerned, [Lambert] makes no effort to distinguish between the statements from the MDIC interviews that he used to impeach the victims and the statements later admitted to give the entire interviews to the jury.[28]

The California contemporaneous objection rule is "clear, consistently applied, and well-established" where, as here, a party fails to make a proper objection to the admission of

---

[28] *People v. Lambert*, No. C056328, 2009 WL 1964335, at *5-7 (Cal. Ct. App. Jul. 9, 2009) (alterations added).  Except for the petitioner's name, this appears exactly as it does in the original.

evidence.[29]  The rule is therefore operative in the case at bar as an "adequate and independent" state procedural bar.[30]  Moreover, the California rule is entirely consistent with federal law as established by the United States Supreme Court, which also requires that an objection state the specific ground on which it is based.[31]

In his traverse, Lambert argues, without citation to authority, that because the trial court did make a finding of reliability over the defense counsel's objection, this preserved his claim and he is not precluded from now bringing his due process claim before this Court.  This Court finds his argument unpersuasive.

First, this Court notes that in his Petition Lambert asserts that the videotapes were admitted as part of the prosecution's case-in-chief.  To the contrary, the court of appeal found they came in *after* the prosecution had rested its case-in-chief and Lambert had shown excerpts of the videotapes for impeachment purposes during questioning of the victims.  Second, the court of appeal also specifically held that Lambert forfeited his constitutional argument by failing to object on constitutional grounds.  The court of appeal also held that Lambert did not make a timely and specific objection based upon reliability.

---

[29] *Melendez v. Pliler,* 288 F.3d 1120, 1124-25 (9th Cir. 2002).

[30] *See Collier v. Bayer,* 408 F.3d 1279, 1283-85 (9th Cir. 2005) (citations omitted).

[31] Fed. R. Evid. 103(a)(1); *see generally Yakus v. United States*, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." (citations omitted)); *see also Peretz v. United States*, 501 U.S. 923, 936-37 (1991) ("The most basic rights of a criminal defendant are similarly subject to waiver." (citations omitted)).

15

This Court agrees with Lambert that both the trial court and the court of appeal ruled on the merits that the hearsay portion of the evidence was reliable.  That does not, however, vitiate a procedural bar defense.[32]  Lambert's first ground is procedurally barred.

In his fourth ground, Lambert argues that the prosecution made disparaging and prejudicial comments directed towards the defense expert.  The court of appeal rejected that argument as well, holding:

> *Alleged Prosecutorial Misconduct*
>
> [Lambert] contends that the prosecutor's comments during closing argument concerning the testimony of defense expert Dr. William O'Donohue, who testified about interviews of young victims, constituted prosecutorial misconduct.  We conclude that [Lambert] forfeited this issue because he failed to object to the prosecutor's comments.  In any event, to the extent the comments were improper, they were not prejudicial.
>
> A. *Background*
>
> Dr. O'Donohue has testified many times in criminal proceedings, about 90 percent of which has been for the defense.  He is paid $400 per hour for his services and $200 per hour for travel.  He is not retained unless he determines that there is a problem with the interviewing done on the victim.
>
> During closing argument, the prosecutor commented on Dr. O'Donohue's testimony.  The prosecutor calculated, based on Dr. O'Donohue's rate and the number of hours he spent on this case, that he had earned $6,400.  The prosecutor stated:  "And for that price, you get a lot of false memories."  Later in the closing argument, the prosecutor returned to the topic of Dr. O'Donohue's alleged bias:  "Doctor O'Donohue.  I am not going to get up here and say Doctor O'Donohue is a boldface liar, and that he doesn't have any place in the criminal justice system, he should just never ever, ever see the face of a courtroom again.  That's not what I am here to say.  [¶]  But when you apply the law, and you apply the law to the opinions of Doctor O'Donohue, and you apply the expert witness law, and the law in regards to how you look at any witness's testimony, bias, interest, or motive, some things are readily apparent.  [¶]  If Doctor O'Donohue got up here and said, I am sorry, [defense counsel], that's a perfect MDIC interview, and these children, no matter how inconsistent, it's perfect.  [¶]  Would he make $400 an hour and $6400 a case if he continued to tell defense attorneys what they didn't want to hear?  Come on, folks.

---

[32] *Comer v. Schriro*, 480 F.3d 960, 964 n.6 (9th Cir. 2007) (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("A state court, however, does not vitiate a procedural bar ruling by addressing the merits of a claim in the alternative.").

"Is he going to get up here and lie, no.  But is he motivated by desire to generate income.  Is he motivated by a desire to be retained again by defense attorneys.  Yes.  [¶]  But, you know, Doctor O'Donohue says these kids are lying, and they are just—they are telling people what they want to hear, you know.  [¶]  They just know that these adults want to hear these horrific things, so that's just what they are telling them.  I mean, Doctor O'Donohue says, look, these are horrible things, and children want to say these things because they are horrible, they want to get this stuff off their chest, you know.  [¶]  And that's why when you see the inconsistencies, I mean, you could tell they are lying."

Defendant did not object to any of the prosecutor's comments concerning Dr. O'Donohue.

B.  *Analysis*

1. Forfeiture

"'[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.  [Citation.]'  [Citation.]"  (*People v. Stanley* (2006) 39 Cal.4th 913, 952.)

Here, [Lambert] did not object to the statements that he now asserts constituted prosecutorial misconduct.  He has therefore forfeited review of the issue on appeal.

Nonetheless, [Lambert] asserts that we should consider the issue because (1) an objection, and resulting admonition, would not have cured the unfairness and (2) the comments infected the trial with unfairness.  Neither assertion has merit.

The only potential problem with the prosecutor's argument is that the defense bought Dr. O'Donohue's conclusion that there had been problems with the interviews ("And for that price, you get a lot of false memories").  If the comment constituted misconduct, a timely objection would have prompted the trial court to admonish the jury to disregard that statement and to remember that argument does not constitute evidence.

Additionally, the comment did not infect the trial with unfairness to the extent that [Lambert] was denied a fair trial.  (See *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 157] [reversal if comments so infected trial as to deny due process]; *People v. Farnam* (2002) 28 Cal.4th 107, 167.)  The prosecutor's comments on Dr. O'Donohue's possible bias occasioned by his profit motive were appropriate observations.  "It is within the bounds of proper argument to attack the credibility of defense expert witnesses, and the weight to be given their testimony, based on the witnesses' compensation and the fact of their employment."  (*People v. Babbitt* (1988) 45 Cal.3d 660, 702.)  To the extent the prosecutor may have gone beyond proper argument to insinuate that Dr. O'Donohue's conclusions were for sale was but a small jump from the proper argument concerning his bias.  Accordingly,

[Lambert's] argument that the comments infected the trial with unfairness is without merit and did not excuse the failure to object.[33]

In his Traverse, Lambert simply makes the conclusory statement that the Respondent's argument that this claim is procedurally barred is incorrect. Lambert advances no argument in support of his conclusory statement. Although the ultimate burden of proving adequacy of a state-procedural bar is on the prosecution, once it has "adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner."[34] Lambert "may satisfy his burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule."[35] Lambert has failed to carry his burden of controverting the procedural bar. Lambert is procedurally barred from bringing his fourth ground in this proceeding.

Grounds 2 and 3

Lambert raised these two grounds in the state-habeas petition. Respondent argues that in citing *Swain* in denying Lambert's habeas petition, the California Supreme Court signified that the petition was denied as untimely and, therefore, review in this Court is procedurally barred.[36]

---

[33] *Lambert*, 2009 WL 1964335 at *11-12 (alterations added). Except for the petitioner's name, this appears exactly as it does in the original.

[34] *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).

[35] *Id.*

[36] This Court notes that Lambert did raise an ineffective assistance of counsel claim in his direct appeal. The claim raised on direct appeal, however, was based upon conduct entirely separate from the claims raised in this proceeding. *Lambert*, 2009 WL 1964335 at *13-14.

This Court disagrees.  At the pinpoint cite in *Swain*, as relevant to this case, the California

Supreme Court held:

> . . .   We are entitled to and we do require of a convicted defendant that he allege with particularity the facts upon which he would have a final judgment overturned and that he fully disclose his reasons for delaying in the presentation of those facts. This procedural requirement does not place upon an indigent prisoner who seeks to raise questions of the denial of fundamental rights in propria persona any burden of complying with technicalities; it simply demands of him a measure of frankness in disclosing his factual situation.
>
> The application for the writ is denied without prejudice to the filing of a new petition which shall meet the requirements above specified.[37]

"[A] procedural default based upon an ambiguous order that does not clearly rest on

independent and adequate state grounds is not sufficient to preclude federal collateral review."[38]

In *Swain*, the California Supreme Court actually relied upon two grounds set forth in two

separate paragraphs, with the word "Furthermore" as the first word in the second paragraph:  (1)

a requirement that the facts justifying relief be presented with particularity; and (2) if belatedly

presented, to explain the delay in raising the question.[39]  Given the pinpoint cite, this Court

cannot determine which of the two grounds in *Swain* the court relied on in this case.[40]

Furthermore, the court in *Swain* granted leave to file an amended petition that met the

requirements *Swain* mandated.  By its cite to *Swain*, this Court assumes that the decision of the

---

[37] *In re Swain*, 209 P.2d 793, 796 (Cal. 1949).

[38] *Valerio v. Crawford*, 306 F.3d 742, 774 (9th Cir. 2002) (alteration in original) (quoting *Morales v. Calderon*, 85 F.3d 1387, 1392 (9th Cir. 1996)) (internal quotation marks omitted).

[39] *Swain*, 209 P.2d at 795.

[40] That differentiates this case from *Carter v. Giurbino*, 385 F.3d 1194, 1197 (9th Cir. 2004), in which the Ninth Circuit held that a general cite to *In re Lindley*, 177 P.2d 918 (Cal. 1947) was sufficient because, as relevant to the federal petition in *Carter*, *Lindley* involved only a single issue.

California Supreme Court in this case was not "final," so that Lambert was precluded from obtaining relief in the state courts.  This Court also notes that, at the time it denied Lambert's petition in this case, the California Supreme Court generally cited *In re Robbins*[41] and *In re Clark*[42] to signify untimeliness,[43] not *Swain*.

Technically, because these two grounds have not yet been properly presented to the state courts, they are unexhausted.  This Court may not consider claims that have not been fairly presented to the state courts.[44]  In discussing the exhaustion requirement, Respondent does so solely in general terms and relieves Lambert of the exhaustion requirement insofar as the claims are understood and discussed in his response, otherwise the claims are unexhausted and procedurally barred.[45]  While this Court agrees that Lambert's second and third grounds are unexhausted, there is a reasonable probability that they would be barred as untimely if brought again in the state courts, and this Court cannot say with an absolute degree of certainty that they are barred.  Consequently, this Court cannot find that Lambert is procedurally barred from bring those two claims.  This court may, however, deny a habeas claim on the merits notwithstanding the failure to exhaust,[46] particularly when it is clear that the petition does not raise a colorable

---

[41] 959 P.2d 311 (Cal. 1998).

[42] 855 P.2d 729 (Cal. 1993).

[43] *See Cooper v. Brown*, 510 F.3d 870, 1001 (9th Cir. 2007).

[44] 28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted).

[45] *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).

[46] 28 U.S.C. § 2254(b)(2).

federal claim.[47]  As discussed further below in the section on the merits, Lambert is not entitled to relief under his second and third grounds in any event.

**B.     Merits**

Grounds 2 and 3: Ineffective Assistance of Counsel Claims

In this case, there is no reasoned state-court decision addressing the second and third grounds.  When there is no reasoned state-court decision denying an issue presented to the state, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."[48]  "The presumption may be overcome when there is reason to think that some other explanation for the state court's decision is more likely."[49]  Where the presumption applies, this Court must perform an independent review of the record to ascertain whether the state-court decision was "objectively unreasonable."[50]  In conducting an independent review of the record, this Court presumes that the relevant state-court decision rested on federal grounds,[51] giving that presumed decision the same

---

[47] *See Cassett v. Stewart,* 406 F.3d 614, 624 (9th Cir. 2005) ("We now join our sister courts . . . and hold that a federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim."); *see Rhines v. Weber*, 544 U.S. 269, 277 (2005) (stating that a court would abuse its discretion by granting a petitioner a stay and abeyance if the unexhausted claims are "plainly meritless." (citing 28 U.S.C. § 2254(b)(2))).

[48] *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989)).

[49] *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

[50] *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (quoting *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005) (per curiam)).

[51] *See Coleman v. Thompson*, 501 U.S. 722, 740 (1991) ("The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to

(continued...)

deference as a reasoned decision.[52]  The scope of this review is for clear error of the state court

ruling on the petition:

> [A]lthough we cannot undertake our review by analyzing the basis for the state
> court's decision, we can view it through the "objectively reasonable" lens ground by
> *Williams* . . . .  Federal habeas review is not *de novo* when the state court does not
> supply reasoning for its decision, but an independent review of the record is required
> to determine whether the state court clearly erred in its application of controlling
> federal law.  Only by that examination may we determine whether the state court's
> decision was objectively reasonable.[53]

"[A]lthough we independently review the record, we still defer to the state court's ultimate

decision."[54]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Lambert must show

both that his counsel's performance was deficient and that the deficient performance prejudiced

his defense.[55]  A deficient performance is one in which counsel made errors so serious that

"counsel was not functioning as the counsel guaranteed by the Sixth Amendment."[56]  Lambert

---

[51](...continued)
question whether there is an independent and adequate state ground for the decision."); *see also
Harris*, 489 U.S. at 263.

[52] *Richter*, 131 S. Ct. at 784-85 (rejecting the argument that a summary disposition was
not entitled to § 2254(d) deference).

[53] *Delgado v. Lewis* (*Delgado II*), 223 F.3d 976, 982 (9th Cir. 2000) (citation omitted).
*But cf. Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) ("Our standard of review is not
controlled by *Delgado v. Lewis* . . . . There, we held that where a state court provides no rational
for a decision, a habeas court does not apply de novo review, but instead determines whether the
state decision was objectively unreasonable based on its independent reading of the record.  Here,
however, the state court was not silent as to its reasoning . . . .  Therefore, we review de novo
whether Lewis waived his right to conflict free counsel . . . .").

[54] *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

[55] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[56] *Id*.

must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.[57]  An analysis that focuses "solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."[58]  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either one of the *Strickland* prongs.[59]

*Strickland* and its progeny do not mandate that this Court act as a "Monday morning quarterback" in reviewing tactical decisions.[60]  Indeed, the Supreme Court admonished in *Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

---

[57] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985) (citing *Strickland,* 466 U.S. at 694).

[58] *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *see Strickland*, 466 U.S. at 687; *see also Kimmel v. Morrison*, 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." (citing *Strickland,* 466 U.S. at 687)); *United States v. Cronic*, 466 U.S. 648, 656 (1984) ("The right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.  Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated." (citations omitted)).

[59] *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

[60] *See Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990).

23

counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.[61]

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933. And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[62]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.[63]

The Supreme Court, applying the "doubly deferential standard," has made clear that when adjudicating ineffective assistance of counsel claims in federal habeas proceedings, unlike the situation on direct review, focus is not on whether counsel's performance fell below the *Strickland* standard. Rather, the focus is on whether the state-court decision holding that counsel

---

[61] 466 U.S. at 689 (internal quotation marks and citations omitted).

[62] *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009).

[63] *See id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003)).

was not ineffective constituted an "*unreasonable* application of federal law[,] [which] is different

from an *incorrect* application of federal law."[64]

> Under § 2254(d), a habeas court must determine what arguments or theories
> supported or, as here, could have supported, the state court's decision; and then it
> must ask whether it is possible fairminded jurists could disagree that those arguments
> or theories are inconsistent with the holding in a prior decision of this Court.[65]

In his second ground, Lambert contends that the failure of his trial counsel to object to the

unsupervised and unlimited admission of the MDIC videotaped testimony of the complaining

witnesses into the jury room during its deliberations constituted ineffective assistance of counsel.

Lambert argues that they were played repeatedly during deliberations, thereby according the

videotapes undue weight and emphasis by the jury.

First, Lambert presents no evidence in his Petition that establishes the tapes were "played

repeatedly" during deliberations.  In his Traverse, Lambert refers to the "Declaration of John

Ward, Exhibit A to Ex Parte Application, par. 4."[66]  He also contends that this argument is more

than mere speculation "in light of both the centrality of the tapes to the prosecution's case against

[Lambert], as well as counsel's statements that the jurors played the tapes repeatedly . . . ."[67]

John Ward was the attorney who represented Lambert in filing his petition for habeas relief in the

California Supreme Court.  His declaration is based upon conversations that he had with

Lambert's trial counsel, David Lynch, who related to Ward that Lynch had talked to some of the

---

[64] *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (alteration added) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

[65] *Id.* at 786.

[66] Referring to Exhibit A attached to the habeas petition filed in the California Supreme Court.  Lodged Doc. No. 10.

[67] Docket No. 20, at 8.

jurors after the trial concerning the playing of the videotapes and the effect those tapes had on the verdict.  This hearsay-on-hearsay testimony raised in a Traverse hardly constitutes adequately reliable evidence to establish the fact that the videotapes were played repeatedly, or that the jury gave them undue weight and emphasis.  Even if Lambert were to provide the affidavit of a juror attesting to those facts, in addition to the fact that the evidence was not presented in the Petition,[68] that evidence is not admissible in this proceeding.[69]

Second, Lambert has cited no Supreme Court decision which held that the introduction of a videotaped interview of a witness as evidence that was allowed to be taken into the jury room constituted a *constitutional* violation.  Neither the state court cases nor the Ninth Circuit case cited by Lambert rise to the level of "clearly established Federal law, as determined by the Supreme Court of the United States."[70]  Lambert has not cited to a decision of a California Appellate Court that would have compelled the trial court to exclude the videotape from the jury room, nor has independent research found such a case.  Indeed, this Court's research indicates that the reverse is true under California law.

---

[68] *See* Rules Governing Section 2254 Cases in the U.S. Dist. Courts, Rule 5(c) (2011); *Mayle v. Felix*, 545 U.S. 644, 655-56 (2005).

[69] Fed. R. Evid. 606(b) (excluding testimony of a juror concerning jury deliberations); *Tanner v. United States*, 483 U.S. 107, 121 (1987) (citations omitted); *Harrison v. Gillespie*, 640 F.3d 888, 895 n.4 (9th Cir. 2011) (en banc) (citations omitted) (declining to consider juror testimony in a federal habeas case because it did not bear on extraneous influences on jury deliberations).

[70] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 402-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).  This Court also notes that the Ninth Circuit decision cited by Lambert, *United States v. Binder*, 769 F.2d 595 (9th Cir. 1985), was based upon the rules of evidence, not constitutional principles, and involved direct review and not a collateral attack.

Under California law, the jury may take into the jury room "all papers (except depositions) which have been received as evidence in the cause, or copies of such public records or private documents given in evidence as ought not, in the opinion of the court, to be taken from the person having them in possession."[71]   Under this provision, transcripts of testimony or interviews given by witnesses that have been admitted in evidence may be given to the jury for consideration during deliberations.[72]   In a case where the jury was allowed to listen during deliberations to a tape recording of the entry into defendant's residence by an undercover police officer to make a purchase of heroin, the court concluded in response to the defendant's claim that the tape recording was improperly given to the jury, that:  "The tape recording had been admitted into evidence without objection.  [T]he law allows the jury to take with them into the jury room all exhibits except depositions."[73]

Indeed, the California Supreme Court in a capital case in which a videotape of a police interview that had not been admitted into evidence was inadvertently substituted for one that had

---

[71] Cal. Penal Code § 1137.  This section also states:

> Upon retiring for deliberation, the jury may take with them all papers (except depositions) which have been received as evidence in the cause, or copies of such public records or private documents given in evidence as ought not, in the opinion of the court, to be taken from the person having them in possession.  They may also take with them the written instructions given, and notes of the testimony or other proceedings on the trial, taken by themselves or any of them, but none taken by any other person.  The court shall provide for the custody and safekeeping of such items.

*Id.*

[72] *People v. Fujita*, 117 Cal. Rptr. 757, 768 (Cal. App. 1974); *People v. Beverly*, 43 Cal. Rptr. 743, 753-54 (Cal. App. 1965).

[73] *People v. Douglas*, 136 Cal. Rptr. 358, 363 (Cal. App. 1977) (citing *Beverly*, 43 Cal. Rptr. at 753).

been properly admitted into evidence, found the error was harmless by comparing it to the

videotape that was "properly admitted and also provided to the jury in the jury room . . . ."[74]  This

suggests that, under California law, an objection to permitting the videotape to go to the jury

likely would have been futile.  This Court also found several unpublished California Court of

Appeal decisions in which the court rejected the argument that videotaped testimony could not be

taken into the jury room.[75]  In each of these cases, the California Court of Appeal rejected the

arguments advanced by Lambert in this case, as well as the contrary decisions of sister-state

courts and the Ninth Circuit in *Binder*.

Third, Lambert identifies no authority for his inference that "supervision" of jury

deliberations is even permissible, let alone required, under any circumstances.  Indeed, it is a

"cardinal principle that the deliberations of the jury shall remain private and secret."[76]  "[T]he

primary if not exclusive purpose of jury privacy and secrecy is to protect jury deliberations from

---

[74] *People v. Gamache*, 227 P.3d 342, 399 (Cal. 2010) (a capital case); *see People v. Weaver*, 29 P.3d 103, 165-166 (Cal. 2001) (in a penalty phase of a capital case the court addressed the issue of whether the jury could consider the hearsay contained in a videotaped interview of the defendant by a psychologist, but not its admissibility or viewing by the jury during deliberations).

[75] *See, e.g., People v. Douglas*, Nos. A122832, A122888, 2010 WL 1511752 at *8-9 (Cal. Ct. App. Apr. 15, 2010) (holding that an objection on that ground would have been unavailing); *People v. Gonzales*, No. E044571, 2009 WL 1299635 at *11-13 (Cal. Ct. App. May 12, 2009); *cf. People v. Reece*, No. B187466, 2007 WL 4336334 at *9 (Cal. Ct. App. Dec. 12, 2007) (rejecting the argument that the jury should have been allowed to view the videotape in the jury room instead of in open court).

[76] *United States v. Olano*, 507 U.S. 725, 737 (1993) (internal quotation marks and citations omitted); *see Yeager v. United States*, 129 S. Ct. 2360, 2368 (2009) ("Courts properly avoid such explorations into the jury's sovereign space . . . ." (citing *United States v. Powell*, 469 U.S. 57, 66 (1984); Fed Rule Evid. 606(b))).

improper influence."[77]   Lambert has not identified just who was to "supervise" the jury's

deliberations.  The judge's traditional role in a jury trial is limited to being an arbiter of the law

and manager of the trial process.[78]   The judge may quite properly instruct a jury on the law and

even comment upon the evidence, drawing their attention to those parts the judge deems

important, even to the extent of expressing an opinion upon the facts, but the judge must

nonetheless make "clear to the jury that all matters of fact are submitted to their determination.[79]

In *Olano*, the Supreme Court noted that although there were alternate jurors which were allowed

to sit in but not participate during jury deliberations, it did not constitute plain error because it

was not prejudicial.[80]   This Court can perceive few circumstances that could be more intrusive

into a jury's deliberative process than the presence of a court-appointed "supervisor" directing

the jury as to when and how often to refer to any particular piece of evidence before it.

Lambert's position is not only unsupported by authority, but counterintuitive to the principles of

secrecy in, and the exclusion of extraneous influences from, jury deliberations.  Because there

was no basis upon which his trial counsel could have objected to the consideration of the

videotapes during jury deliberations, Lambert is not entitled to relief under his second ground.

---

[77] *Olano*, 507 U.S. at  737-38.

[78] *See Quercia v. United States*, 289 U.S. 466, 469 (1933) (citations omitted) ("[T]he judge is not mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." (citations omitted)).

[79] *Id.* (citations omitted); *United States v. James*, 576 F.2d 223, 228 (9th Cir. 1978) (citing *Quercia*, 289 U.S. at 469); *see Navellier v. Sletten*, 262 F.3d 923, 942-43 (9th Cir. 2001) (applying the rule in a civil case).

[80] *Olano*, 507 U.S. at 737-38 (citations omitted).

In his third ground, Lambert contends that his trial counsel was ineffective for failing to retain a psychological expert to evaluate the possibility of offering expert testimony that Lambert was not a pedophile and that he did not have the psychological predisposition to commit the acts of which he was accused.

The fatal flaw in Lambert's argument is that it is based upon sheer conjecture and speculation, i.e., a *possibility* that an expert would have so testified.  Lambert offers no evidence, e.g., the declaration of a psychological expert who has examined him and determined, based upon his expert opinion, that Lambert is not a pedophile or is lacking the psychological predisposition to commit acts of pedophilia.  This Court cannot grant habeas relief based upon "little more than speculation with slight support."[81]  Lambert is not entitled to relief under his third ground.

Ground 5:  Limitation on Cross-Examination of Complaining Witness's Mother

In 1998 one of the complaining witnesses had complained to her mother that her brother had sexually abused her.[82]  The trial court precluded defense counsel from cross-examining the mother on this issue.  Lambert contends that denying him the right to cross-examine the mother effectively precluded him from presenting a complete defense.

---

[81] *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam).

[82] This Court notes with a degree of displeasure that counsel for Lambert provided the names of the witness and the brother in his Petition and the names of both complaining witnesses in his Traverse.  As all were minors, they should have been identified by initials only.  Fed. R. Civ. P. 5.2.  Counsel is admonished that he should become more familiar with, and adhere to, the Federal Rules of Civil Procedure.

The court of appeal rejected Lambert's arguments, holding:[83]

### Exclusion of Prior Complaint

[Lambert] sought to introduce evidence that A. had made a prior false complaint that she had been molested. When A. was three years old, she said that [Lambert] had molested her, and then she changed her story, saying that her brother had molested her. The trial court excluded the evidence pursuant to Evidence Code section 352. [Lambert] asserts that the exclusion of the evidence violated his constitutional fair trial rights. We conclude that (1) [Lambert] forfeited the issue of a violation of his fair trial rights because he did not make that constitutional argument in the trial court and (2) the trial court did not abuse its discretion pursuant to Evidence Code section 352 and, therefore, did not violate [Lambert's] fair trial rights.

A. *Background*

During trial, [Lambert's] attorney sought permission from the court to introduce evidence concerning a false report of molestation by A. He wanted to ask C. whether A. had accused [Lambert] of "lick[ing][her] peepee." C. took A. to the hospital and, there, she told C., "actually [Lambert] didn't lick my peepee, [my brother] did it, but [she] didn't want to get [him] in trouble." [Lambert's] attorney expected that C. would testify that A. said [Lambert] had molested her to protect her brother. At the time of the complaint, A. was three years old and her brother was four years old. No action was taken on the complaint because it was considered false. The trial court asked [Lambert's] attorney how he knew it was a false report, and the attorney responded, "Because when she says [Lambert] didn't do it, she is saying that it's a false report."

Acting pursuant to Evidence Code section 352, the trial court excluded the evidence, stating: "I am going to find that the prejudicial value—I think the prejudicial effect of allowing this is immense in terms of confusion as particularly illustrated by the discussion we just had. [¶] There is—there is not an indication that this is a false report. If she is saying [Lambert] licked my pee pee, and she is referring to [Lambert], we don't know if that's false or not. [¶] . . . [¶] [A]t any rate, the consumption of time it would take with the jury would be considerable. [¶] In turn, considering the probative value there is certainly enough ambiguity in what the witness has stated both here in court and also when confronted with prior statements that I think that adds very little additional probative value especially in light of not understanding whether it is a false report or a true report. [¶] . . . [¶] So it appears to me the prejudicial effect far outweighs any probative value."

B. *Analysis*

1. Forfeiture

---

[83] This Court notes that although Respondent noted the court of appeal held that Lambert had forfeited this claim on constitutional grounds by failing to make a constitutional argument in the trial court in his memorandum of law, unlike Grounds one through four, Respondent did not raise procedural bar as a defense to this claim in his answer.

[Lambert] failed to raise his current constitutional argument, that exclusion of the alleged prior false complaint evidence violated his constitutional fair trial rights.  He therefore forfeited review of the issue on appeal.

2. Merits

Even assuming defendant did not forfeit review of this issue on appeal, it is without merit.  "Evidence Code [s]ection 352 provides: 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'  '[A] trial court's exercise of discretion under Evidence Code section 352 will not be reversed on appeal absent a clear showing of abuse. [Citations.]  It is also established that "'Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and his right to present all relevant evidence of significant probative value to his defense."'  [Citations.]  This does not mean that an unlimited inquiry may be made into collateral matters; the proffered evidence must have more than "slight-relevancy" to the issues presented.  [Citation.]  . . .  [Citation.]  The proffered evidence must be of some competent, substantial and significant value.  [Citations.]'  (*People v. Northrop* (1982) 132 Cal.App.3d 1027, 1042, italics omitted, disapproved on other grounds in *People v. Smith* (1984) 35 Cal.3d 798, 807-808.)  A trial court's exercise of discretion under section 352 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]'  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)"  (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457.)

A false complaint of molestation is relevant to the victim's credibility.  However, the prior complaint is not relevant unless it is proved to be false.  (*People v. Tidwell, supra,* 163 Cal.App.4th at p. 1457.)

Here, the trial court did not abuse its discretion.  It is not readily apparent which version of A.'s complaint she made when she was three years old (whether she was touched by [Lambert] or by her brother) was the true version, if either was true.  Trying to establish whether it was false that [Lambert] had molested A. and true that her brother touched her would have been confusing to the jury and tangential to the issues being tried.  The evidence may have been relevant to A.'s credibility if the jury were to conclude that the complaint about defendant was false; however, what A. said when she was three had little relevance to her credibility when she was eight (at the time of the crimes) or 12 (at the time of trial).  The evidence relating to credibility was weak and potentially confusing.  Under these circumstances, the trial court did not abuse its discretion in excluding the evidence pursuant to Evidence Code section 352.

"Application of the ordinary rules of evidence generally does not impermissibly infringe on a[ ] defendant's constitutional rights."  (*People v. Kraft*

32

(2000) 23 Cal.4th 978, 1035.)  Therefore, [Lambert's] constitutional argument is without merit.[84]

It is well-settled law that a criminal defendant has a constitutional right to present a defense.[85]  This right is not, however, unfettered or without limitation.  "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."[86]  This latitude, however, has limits.  "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"[87]  This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"[88]  The Supreme Court has stated:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.[89]

---

[84] *People v. Lambert*, No. C056328, 2009 WL 1964335 at *9-11 (Cal. Ct. App. July 9, 2009) (alterations added).  Except for the petitioner's name, this appears exactly as it does in the original.

[85] *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation omitted).

[86] *United States v. Scheffer,* 523 U.S. 303, 308 (1998); *see Crane,* 476 U.S. at 689-690; *Marshall v. Lonberger,* 459 U.S. 422, 438, n.6, (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules . . . ." (citation omitted)); *Chambers v. Mississippi,* 410 U.S. 284, 302-303 (1973); *Spencer v. Texas,* 385 U.S. 554, 564 (1967).

[87] *Crane,* 476 U.S. at 690 (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984)).

[88] *Scheffer,* 523 U.S. at 308 (quoting *Rock v. Arkansas,* 483 U.S. 44, 56, 58 (1987)).

[89] *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) (citing Fed. R. Evid. 403).

The Supreme Court has repeatedly held that the Constitution permits judges "to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'"[90]

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts."[91]  "The introduction of unfairly prejudicial evidence against a defendant in a criminal trial . . . does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice."[92]  "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."[93]  In criminal actions, "[t]he States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution."[94]  The Supreme Court has made clear that federal habeas power does not allow granting relief on the basis of a belief that the state-trial court incorrectly interpreted the state-evidence code in ruling on the admissibility of evidence.[95]  In deciding cases involving the Federal Rules of Evidence or federal evidentiary statutes, the Supreme Court is acting in its supervisory capacity over the lower

---

[90] *Crane,* 476 U.S. at 689-690 (alterations in original) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)); *see Montana v. Egelhoff,* 518 U.S. 37, 42-43 (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").

[91] *Crane*, 476 U.S. at 689.

[92] *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998).

[93] *Marshall v. Lonberger,* 459 U.S. 422, 438 n.6 (1983) (citation omitted); *see also Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

[94] *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967).

[95] *McGuire*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

federal courts.[96]  "'Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.'"[97]

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code § 352, permits the exclusion of evidence if its probative value is "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."[98]  California employs a similar rule.[99]  This Court notes that, although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation,[100] the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.  Indeed, quite to the contrary, the Supreme Court has strongly suggested

---

[96] *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 ("It is beyond dispute that we do not hold a supervisory power over the courts of the several states." (quoting *Dickerson v. United States*, 530 U.S. 428, 438 (2000))).

[97] *Smith v. Philips*, 455 U.S. 209, 221 (1982) (citations omitted).

[98] *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and County of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009) ("The decision to admit potentially prejudicial evidence under Rule 403 is 'committed to the sound discretion of the trial court.'" (quoting *United States v. Blitz*, 151 F.3d 1002, 1008 (9th Cir.1998))).

[99] *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

[100] *See Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc) ("A particular abuse of discretion by a state court may amount also to a violation of the Constitution, but not every state court abuse of discretion has the same effect.").

that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.[101]

Whether or not Lambert's fifth ground is procedurally barred is irrelevant.  Lambert's fifth ground does not present a question of constitutional dimension in any event.

## V.  CONCLUSION AND ORDER

Lambert is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[102]  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.[103]

The Clerk of the Court is to enter judgment accordingly.

**IT IS FURTHER ORDERED THAT**

1. the Clerk of the Court is hereby directed to seal the Petition (Docket No. 1) and Traverse (Docket No. 20); and

---

[101] *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) ("It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of clearly established Federal law." (citing § 2254(d)(1)).

[102] 28 U.S.C. § 2253(c); *Banks v. Dretke,* 540 U.S. 668, 705-06 (2004) ("To obtain a certificate of appealability a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's  resolution of his constitutional claims or that jurists could conclude  the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).

[103] *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.

2.  within **fourteen (14) days** of the date this Order is entered, counsel for Lambert must file a substitute Petition and Traverse for the public record in which the names of the minors are either redacted or replaced by initials.[104]

Dated: January 5, 2012.

/s/ James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
United States District Judge

---

[104] *See* Fed. R. Civ. P. 5.2(d).